```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------------x
 3  UNITED STATES OF AMERICA,
 4                                    Case No. 21-mj-866
 5      -vs-
 6  JEFFREY P. SABOL,
 7                          Defendant.
 8  ------------------------------------x
 9                              United States Courthouse
                                White Plains, New York
10                              January 11, 2021
11          ** VIA VIDEO AND TELECONFERENCE **
12
13  B e f o r e:
14                          HONORABLE ANDREW E. KRAUSE
15                          Magistrate Judge
16  A P P E A R A N C E S:
17  AUDREY STRAUSS
        United States Attorney for the
18      Southern District of New York
    BENJAMIN A. GIANFORTI
19      Assistant United States Attorneys
20  FEDERAL DEFENDERS OF NEW YORK, INC.
    JASON I. SER
21      Attorney for Defendant
22  ALSO PRESENT:
23  SPECIAL AGENT MICHAEL CALLANAN, FBI
    VINCE ADAMS, OFFICE OF PRETRIAL SERVICES
24  DETECTIVE BRIAN CALLAHAN, FBI
25  *Proceedings recorded via digital recording device*
```

1.22.21 INITIAL                    PROCEEDINGS                    2

```
 1              THE DEPUTY CLERK:  Good afternoon.  This is the matter
 2   of United States of America versus Jeffrey Sabol.  The Honorable
 3   Andrew Krause presiding.
 4              Counsel, please state your name for the record,
 5   starting with the government.
 6              MR. GIANFORTI:  Good afternoon, Your Honor.  Ben
 7   Gianforti for the government.
 8              THE COURT:  Good afternoon, Mr. Gianforti.
 9              Mr. Ser, you are muted.
10              MR. SER:  I apologize.  Good afternoon.  Jason Ser,
11   Federal Defenders for Mr. Sabol, who is appearing via video.
12              THE COURT:  Good afternoon, Mr. Ser.
13              Good afternoon, Mr. Sabol.
14              We have someone from Pretrial Services on the line as
15   well, correct?
16              OFFICER ADAMS:  Yes, Your Honor.  Vince Adams.
17              THE COURT:  Good afternoon, Mr. Adams.
18              Okay.  My name is Magistrate Judge Krause.  We are
19   here today for an initial appearance.  Let me start by saying
20   that we are in the midst of the Covid-19 pandemic, as everybody
21   knows.  I'm conducting this proceeding pursuant to the authority
22   provided by Section 15002 of the CARES Act and the standing
23   orders issued by our Chief Judge pursuant to the act.  Counsel
24   are appearing before me today by video and telephone.  Mr. Sabol
25   is also appearing before me today by video and telephone.  I
```

1  will note that this telephone line is open to the public and the

2  press on a listen-only basis, and I will remind anybody who is

3  listening that any recording of this proceeding is strictly

4  prohibited.

5            I would like to make sure that everybody is able to

6  see and hear everybody else who is participating today so far.

7            Mr. Gianforti, are you able to see and hear everybody?

8            MR. GIANFORTI:  Yes, Your Honor.  I can see you and

9  hear you and everybody else.

10            THE COURT:  Thank you.  Mr. Ser, are you able to see

11  and hear everybody?

12            MR. SER:  Yes, Your Honor.

13            THE COURT:  Thank you.  Mr. Sabol, are you able to see

14  and hear everybody so far?

15            THE DEFENDANT:  Yes, Your Honor.

16            THE COURT:  And, Mr. Adams, are you able to hear

17  everybody so far?

18            OFFICER ADAMS:  Yes, Your Honor.

19            THE COURT:  Very good.  And for everybody who is

20  participating in the proceeding today, if you have any

21  difficulty hearing or you lose the video feed for whatever

22  reason, please just do whatever you can to try to let me know so

23  I can stop the proceeding, and we can try to make whatever

24  adjustments need to be made.  If you are on video, just make a

25  hand signal or something to let me know that you have lost the

1  audio; and if you have any problems with the audio or video, you

2  just speak up right away, even if it means interrupting me or

3  anybody else who is speaking so that we can be sure to try to

4  fix that as promptly as we can.

5          For those of you who will be speaking at various

6  points during the proceedings today, I will most often be

7  calling on you specifically to speak, so it will be clear who is

8  speaking at any given time.  If there is a time when you need to

9  speak, and I haven't specifically called on you, please be sure

10  to identify yourself so that the record can be clear when it

11  comes time to create a transcript of the proceedings.

12          Along those same lines, I will ask that we all do our

13  best not to try to speak over one another.  I know that can be

14  difficult sometimes with these video and telephone, but let's

15  all do our best.  Again, it will make it easier to create a

16  transcript of the proceeding if only one person is speaking at a

17  time.

18          Mr. Sabol, I understand that you are located in the

19  marshal service holding area in the federal courthouse in White

20  Plains at 300 Quarropas Street.  Can anybody who -- any agent or

21  investigator who is currently present with Mr. Sabol please

22  identify themselves for the record?

23          SPECIAL AGENT CALLANAN:  Good afternoon, Your Honor.

24  Mike Callanan, Special Agent FBI New York.

25          THE COURT:  Good afternoon, Special Agent Callanan.

 1              Anybody else or is it just Special Agent Callanan?

 2              DETECTIVE CALLAHAN:  Detective Brian Callahan, CFO for

 3 the FBI.

 4              THE COURT:  Good afternoon, Detective Callahan.

 5              DETECTIVE CALLAHAN:  Good afternoon.

 6              THE COURT:  Mr. Ser, has Mr. Sabol had an opportunity

 7 to consult with you in advance of the proceeding here today?

 8              MR. SER:  Yes, Your Honor, he and I had several hours

 9 to speak on the phone prior to the case being called today.

10              THE COURT:  Thank you, Mr. Ser.

11              I don't believe we are going to need any signatures

12 today.  It appears that the documents that need to be signed

13 have been signed already, but we will address that in due

14 course.

15              Mr. Sabol, you have a right to an attorney for all

16 court proceedings, including this one, and during any

17 questioning by the authorities.  You have a right to hire your

18 own attorney, but if you cannot afford one, I will appoint one

19 to represent you at the government's expense.  Do you understand

20 that?

21              THE DEFENDANT:  Yes, sir.

22              THE COURT:  Mr. Ser, I see that I have not received a

23 financial affidavit, and that Mr. Sabol, on advice of counsel,

24 did not complete financial information as part of the pretrial

25 services report; is that correct?  Am I missing something?

1    MR. SER:  No, Your Honor.  That's correct.  Mr. Sabol

2  will and plans to retain counsel.  Based upon his financial

3  status, he may not qualify for appointed counsel; likely would

4  not.

5    THE COURT:  Okay.  Thank you, Mr. Ser.  So is it

6  accurate to say that you are seeking to be appointed, Mr. Ser,

7  only for purposes of the presentment and any associated

8  proceedings here today?

9    MR. SER:  Please, Your Honor.  Provisional appointment

10  is what we would be seeking today.

11    THE COURT:  Okay.  I will appoint Mr. Ser

12  provisionally to represent Mr. Sabol for the proceedings that we

13  are here for today.

14    Mr. Sabol, I advise you that you must retain counsel

15  in this matter.  It sounds as though you are already in the

16  process of doing that, but I urge you to do that quickly and

17  efficiently.  You are facing serious charges here, and it's

18  important that you be represented by counsel at all stages of

19  the proceedings, and so please make sure to complete that

20  process of retaining counsel as quickly as possible.

21    THE DEFENDANT:  Yes, Your Honor.

22    THE COURT:  I see that Mr. Sabol seems to be having a

23  little bit of difficulty hearing.  Is it possible to turn up the

24  volume on that end at all?

25    (Inaudible)

 1            SPECIAL AGENT CALLANAN:  Your Honor, everybody seems

 2    to be coming through loud and clear except for yourself.

 3            THE COURT:  Okay.

 4            SPECIAL AGENT CALLANAN:  Perhaps the distance between

 5    you and the microphone or --

 6            THE COURT:  Okay.  Let me try to move the phone closer

 7    for me and see if that helps at all.  Thank you.

 8            All right.  We will try that.  Is that any better?

 9            THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  Okay.  Good.  I'm glad we did that.

11            All right.  Let me turn then, Mr. Sabol, to our next

12    matter.  Under normal circumstances, Mr. Sabol, everyone

13    participating in this proceeding would be physically present in

14    court.  Indeed, you have the right to be physically present in

15    court for most proceedings, but pursuant to the CARES Act, to

16    ensure the safety of everyone involved in this proceeding, and

17    to limit the spread of the Covid-19 virus, we are conducting

18    this proceeding today by videoconference and telephone.  I'm

19    going to ask you a series of questions to confirm that you do

20    agree to proceed this way today by video and telephone.

21            I have in front of me a document that's labeled

22    Consent to Proceed by Video or Teleconference.  It's been signed

23    by Mr. Ser, and Mr. Ser has also added your electronic signature

24    to the document.

25            Mr. Sabol, did you have an opportunity to discuss with

1  Mr. Ser today the issue of waiving your right to be physically

2  present in court, and to instead participate in this initial

3  appearance by video and telephone?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Did you speak with Mr. Ser and give him

6  authorization to sign this Consent to Proceed by Video or

7  Teleconference form on your behalf?

8           THE DEFENDANT:  Yes, Your Honor.

9           THE COURT:  Just to be clear, signing this form

10 indicates that you waive your right to be physically present and

11 instead participate by video and telephone.  Mr. Sobel, let me

12 just confirm, do you, in fact -- excuse me, Mr. Sabol -- do you,

13 in fact, agree to waive your right to be physically present in

14 court and instead participate in this proceeding by video and

15 telephone?

16          THE DEFENDANT:  I agree, Your Honor.

17          THE COURT:  Mr. Ser, I see you have signed the form

18 already, but let me also confirm for the record that you agree

19 to have this proceeding conducted by video and telephone here

20 today?

21          MR. SER:  I do, Your Honor, yes.

22          THE COURT:  Thank you, Mr. Ser.  I find that Mr. Sabol

23 has knowingly and voluntarily waived his right to be present in

24 the courtroom and to instead participate in this conference by

25 telephone and video.  I will sign the consent form on behalf of

1  the Court.

2          Mr. Sabol, I want to advise you that the proceeding

3  today is not a trial, and you will not be called upon to answer

4  or plead to any charges at this time.  This proceeding is called

5  an initial appearance, and the purpose of today's proceeding is

6  to advise you of your rights, inform you of the charges against

7  you, and determine whether bail should be set that may allow you

8  to be released, and if so, what that bail should be.

9          Pursuant to Rule 5(c) of the Federal Rules of Criminal

10 Procedure, if an individual is arrested in a district other than

11 the district where the offenses were allegedly committed, the

12 initial appearance ordinarily takes place in the district of

13 arrest, which in this case is here, the Southern District of New

14 York.  That's why today's proceeding is taking place here in New

15 York rather than in the district of the District of Columbia or

16 the District of D.C., as I will refer to it throughout the

17 proceedings today, which is where the alleged offenses took

18 place.  Do you understand that so far, Mr. Sabol?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Mr. Sabol, you have the right to remain

21 silent at this and every stage of the proceedings.  Any

22 statement that you do make may be used against you.  You have

23 this right to remain silent even if you have already made

24 statements to law enforcement officers, and you are not required

25 to answer any questions that law enforcement officers ask you

1    from this moment on.  For that reason, I suggest that you

2    consult with counsel before answering any questions that you may

3    be asked.  Do you understand that?

4             THE DEFENDANT:  Yes, Your Honor.

5             THE COURT:  One more word about your right to counsel,

6    Mr. Sabol.  You do have the right to retain an attorney of your

7    own choosing, which is what I understand you intend to do in

8    this case; but if you should become unable to afford the

9    services of counsel, you may apply to the Court for appointment

10   of counsel, and if the Court determines that you are financially

11   unable to afford an attorney, one will be appointed to represent

12   you without cost to you.  Do you understand that as well?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  Mr. Sabol, if you are not a United States

15   citizen, you would have the right to request that a government

16   attorney or a law enforcement official notify a consular officer

17   from your country of origin that you have been arrested.  I

18   understand from the pretrial services report, though, that you

19   are a citizen of the United States; is that correct?

20            THE DEFENDANT:  That is correct, Your Honor.

21            THE COURT:  We will move on then.

22            Ms. Brown, will you please place Mr. Sabol under oath

23   or affirmation?

24   JEFFREY SABOL, having been duly sworn, testified as follows:

25            THE DEFENDANT:  I do.

 1            THE DEPUTY CLERK:  Thank you.  You can put your hand

 2  down.

 3            THE COURT:  Thank you, Ms. Brown.

 4            Mr. Sabol, you are under oath now.  It is important

 5  for you to understand that if you knowingly make a false

 6  statement during these proceedings, you could be subject to

 7  prosecution for perjury or for making a false statement to the

 8  Court, and you could face a punishment of up to five years in

 9  prison, and a $250,000 fine if you are convicted of those

10  offenses.  This punishment would be separate and apart from any

11  sentence you may be facing on the crime charged in the complaint

12  that we are here on today.  Do you understand that?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  It is also important for you to understand

15  that any false statement that you make during this proceeding,

16  as well as any false statement that you may have made already to

17  Pretrial Services, may be used against you at trial if you

18  decide to testify at trial.  Do you understand that as well?

19            THE DEFENDANT:  Yes, Your Honor.

20            THE COURT:  Mr. Sabol, would you please state your

21  full name for the record?

22            THE DEFENDANT:  Jeffrey Patrick Sabol.

23            THE COURT:  How old are you, Mr. Sabol?

24            THE DEFENDANT:  Fifty-one.

25            THE COURT:  Do you have any difficulty reading,

1    writing, speaking or understanding English?

2              THE DEFENDANT:  No, but I do need reading glasses.

3              THE COURT:  Understood.  How far did you go in school,

4    Mr. Sabol?

5              THE DEFENDANT:  I have a Bachelor's degree.

6              THE COURT:  Mr. Sabol, have you taken or used any

7    drugs, alcohol, or medication within the last 24 hours?

8              THE DEFENDANT:  I have some antibiotic drugs that I

9    have taken once every six hours.

10              THE COURT:  Okay.  And are you sufficiently clear in

11    your mind today?  Do you understand what is happening at these

12    proceedings?

13              THE DEFENDANT:  Yes, Your Honor.

14              THE COURT:  Mr. Sabol, if you've made any statements

15    to Pretrial Services that you would like to correct or add to in

16    any way, you should discuss that with your counsel so that the

17    record can be corrected.  Do you understand that?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  Mr. Ser, are there any corrections or

20    additions to be made to the pretrial services report at this

21    time?

22              MR. SER:  Not that I am aware of, Your Honor.

23              THE COURT:  Thank you.

24              Mr. Gianforti, may I have the time and date of arrest?

25              MR. GIANFORTI:  Yes, Your Honor.  Mr. Sabol was

1  arrested this morning, January 22nd, 2021, at approximately

2  8:00 a.m. at the Westchester Medical Center.

3              THE COURT:  Thank you, Mr. Gianforti.

4              Mr. Sabol, I am now going to review the charges

5  against you.  I have before me an affidavit which attaches the

6  arrest warrant in this case, as well as underlying documents,

7  which include a criminal complaint, and an agent's affidavit in

8  support of that criminal complaint.  This affidavit was prepared

9  by Special Agent Callanan, who is with you there in the holding

10 area.

11             Special Agent Callanan, would you please come and be

12 visible on the screen for me?

13             SPECIAL AGENT CALLANAN:  Yes, Your Honor.

14             THE COURT:  Are you, in fact, Special Agent Michael

15 Callanan?

16             SPECIAL AGENT CALLANAN:  Yes, Your Honor.

17             THE COURT:  Please raise --

18             (Interruption)

19             THE COURT:  Special Agent Callanan, do you swear or

20 affirm that the information contained in the Rule 5(c)(3)

21 affidavit is true and complete to the best of your knowledge and

22 belief?

23             Oh, we have lost the audio.  Okay.  It appears that we

24 have lost the audio for Mr. Sabol, and the marshals are

25 attempting to get him back connected to the AT&T conference

 1  line.

 2          (Pause)

 3          THE COURT:  Okay.  Mr. Sabol, are you able to hear me

 4  now?  I believe you are muted on your end, though.

 5          Mr. Sabol, are you able to hear me now?

 6          THE DEFENDANT:  Yes, Your Honor.

 7          THE COURT:  And I am able to hear you as well.  Okay.

 8  Thank you, everybody, for your patience and for taking care of

 9  this technical issue.  Do I have Special Agent Callanan?  Can I

10  have you back on the screen?

11          SPECIAL AGENT CALLANAN:  Yes, Your Honor.

12          THE COURT:  Special Agent Callanan, are you, in fact,

13  Special Agent Michael Callanan?

14          SPECIAL AGENT CALLANAN:  Yes, Your Honor.

15          THE COURT:  Please raise your right hand.  Do you

16  swear or affirm that the information contained in this Rule

17  5(c)(3) affidavit is true and complete to the best of your

18  knowledge and belief?

19          SPECIAL AGENT CALLANAN:  I do, Your Honor.

20          THE COURT:  Thank you, Special Agent Callanan.  You

21  can step aside.

22          Mr. Sabol, you've been arrested pursuant to a warrant

23  from the United States District Court for the District of D.C.

24  The underlying charge against you in that district is based on a

25  criminal complaint that asserts a number of allegations against

1  you, specifically, the one charge contained in the complaint,

2  the allegation is that you violated Title 18 United States Code

3  Section 231(a)(3), which makes it unlawful to commit, or attempt

4  to commit, any act to obstruct, impede, or interfere with any

5  law enforcement officer lawfully engaged in the lawful

6  performance of his official duties incident to and during the

7  commission of a civil disorder, which in any way or degree

8  obstructs, delays, or adversely affects the conduct or

9  performance of any federally-protected function.  The provisions

10  of that statute are set forth in further detail in the criminal

11  complaint.

12          Mr. Sabol, have you seen a copy of the affidavit, the

13  search -- excuse me -- the affidavit, the arrest warrant, the

14  criminal complaint, and the affidavit in support of the criminal

15  complaint?  Have you seen a copy of those documents, either a

16  paper copy or an electronic copy?

17          THE DEFENDANT:  I have in front of me a Statement of

18  Facts.  I have an arrest warrant, and I have a criminal

19  complaint.

20          THE COURT:  Okay.  The Statement of Facts is what I am

21  referring to as the Agent Affidavit in Support of the Criminal

22  Complaint.  It is styled here as a Statement of Facts, but that

23  term that I am using is Agent Affidavit in Support of the

24  Criminal Complaint is the Statement of Facts.  That is one and

25  the same.

1    Have you had an opportunity to review those materials,

2  Mr. Sabol?

3    THE DEFENDANT:  I -- Mr. Ser did read them to me

4  earlier, yes.

5    THE COURT:  Okay.  And it's not unusual at this point

6  for you to not have received a copy at all, as long as you have

7  had an opportunity to review them with counsel; but now that you

8  have a copy, you will be able to review them at your leisure as

9  this case proceeds.

10    Mr. Ser, have you received a copy of all of the

11  relevant documents in this case, including the 5(c)(3)

12  affidavit, the arrest warrant, the criminal complaint, and the

13  documents submitted in support of the criminal complaint?

14    MR. SER:  I have, Your Honor, and I had an opportunity

15  during my call earlier with Mr. Sabol to read and explain the

16  Statement of Facts, as well as the criminal complaints, and the

17  arrest warrant.  I received the Rule 5(c)(3) affidavit a little

18  bit before the hearing beginning, but the prosecutor was kind

19  enough to explain to me via telephone what the contents would

20  be, which I then explained, in turn, to Mr. Sabol.  I do believe

21  he understands everything, and he will waive the public reading

22  of the documents.

23    THE COURT:  Thank you, Mr. Ser.

24    I just need Special Agent Callanan back for one

25  second.  My apologies.  I forgot to do this when you were here

```
 1  before.  Special Agent Callanan, the version of the 5(c)(3)
 2  affidavit that I have before me, you've now been sworn as to it,
 3  but I have an unsigned version of it here.  Do I have your
 4  permission to sign this document on your behalf?
 5          AGENT CALLANAN:  Yes, Your Honor.
 6          THE COURT:  Thank you, Special Agent Callanan.
 7          Okay.  Mr. Sabol, you have the right to what's called
 8  an identity hearing, which is a hearing on the issue of whether
 9  you are the person named in the warrant and the underlying
10  documents.  You also have a right to waive that hearing.
11          Mr. Ser, what is Mr. Sabol's position with respect to
12  the identity hearing?
13          MR. SER:  He's prepared to waive the hearing, Your
14  Honor.
15          THE COURT:  Okay.  Thank you, Mr. Ser.
16          Mr. Sabol, you also have the right to a different type
17  of hearing, which is called a preliminary hearing, which would
18  take place either in this district or in the District of D.C.
19          At the preliminary hearing, the government will have
20  the burden of establishing that there is probable cause to
21  believe that the crime for which you are being charged has been
22  committed, and that you are the person who committed it.  At the
23  preliminary hearing, you or your attorney would be entitled to
24  cross-examine any witnesses and to introduce evidence.
25          If you are in custody, Mr. Sabol, you have the right
```

1   to have a preliminary hearing within 14 days.  If you are not in

2   custody, you have the right to have a preliminary hearing within

3   21 days.  However, such a preliminary hearing will not be held

4   if, before the scheduled date for that hearing, you are indicted

5   by a grand jury or an information is filed against you by the

6   government.  Do you understand that?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  Mr. Sabol, you also have the right to

9   waive a preliminary hearing.

10          Mr. Ser, have there been any discussions about setting

11  a date for the preliminary hearing?

12          MR. SER:  Yes, Your Honor.  I spoke with Mr. Gianforti

13  earlier, and I conferred with Mr. Sabol as well.  We will

14  consent now to 30 days on the preliminary hearing in this

15  matter.

16          THE COURT:  Let us look at the calendar and figure out

17  exactly what 30 days is.  Because today is a Friday, 30 days

18  will fall on a Sunday, so I will schedule a preliminary hearing

19  28 days from today as a control date.  So we will mark the date

20  for the preliminary hearing as Friday, February 19th, which is

21  28 days from today.

22          Mr. Sabol, I'm also required to tell you that you may

23  choose to be prosecuted in this district, that is the Southern

24  District of New York, if you wish to plead guilty to the charge

25  you are facing and waive trial in the District of D.C., but --

1  that would be one condition -- but the other condition would be

2  that the United States Attorneys in both districts, that is,

3  here in the Southern District of New York and in the District of

4  D.C., must approve the transfer.  Otherwise, if you eventually

5  plead not guilty, you would have to face these charges in the

6  District of D.C., where further proceedings will take place.

7           Mr. Ser, have you had an opportunity to confer with

8  Mr. Sabol about his Rule 20 rights?

9           MR. SER:  Your Honor, I conferred with Mr. Gianforti.

10 It's our understanding that the District of D.C. will not be

11 consenting to transfer, and I don't anticipate any sort of

12 immediate plea.  So as a result, I think the issue is moot at

13 this time.

14          THE COURT:  Thank you, Mr. Ser.

15          Mr. Gianforti, anything to add to that?

16          MR. GIANFORTI:  No, that's consistent with my

17 understanding, Your Honor.

18          THE COURT:  Okay.  Thank you.  I will next turn to the

19 question of bail detention or release for Mr. Sabol at this

20 time.

21          Mr. Gianforti, what is the government's position?

22          MR. GIANFORTI:  Your Honor, the government is seeking

23 detention in this matter.

24          THE COURT:  On what grounds?

25          MR. GIANFORTI:  Both dangerousness and flight, Your

```
 1  Honor.
 2          THE COURT:  Okay.  I'm just going to -- I'm going to
 3  hear from you, Mr. Gianforti, and then I will hear from you,
 4  Mr. Ser.  I'm just going to try to move the phone over so that I
 5  am in a better position to take notes here during the arguments.
 6  If at any point you have difficulty hearing me, Mr. Sabol,
 7  because I have moved the phone further away from me, please say
 8  so, and I will figure something out.
 9          THE DEFENDANT:  Yes, Your Honor.
10          THE COURT:  Okay.  Mr. Gianforti, let's start with
11  you.
12          MR. GIANFORTI:  Thank you, Your Honor.
13          Your Honor, this is yet another criminal prosecution
14  stemming from the mob violence at the U.S. Capitol on January 6,
15  2021, and you know, it's been widely reported that, you know,
16  this may have started as a legitimate expression of First
17  Amendment rights, albeit in an apparent attempt to overturn a
18  legitimate election, but it quickly devolved into a full-on
19  assault on members of law enforcement, lawmakers and the Capitol
20  itself; and this defendant took place in part in that violence,
21  Your Honor.  And unfortunately for the defendant, this is yet
22  another case in which the defendant was captured on video.  I
23  believe it's more than one video.  And indeed, one of those
24  videos I provided to the Court and to Mr. Ser in advance of this
25  proceeding; and for reference, that is -- it's referred to as
```

1 Video 1 in the agent affidavit supporting the complaint.  I

2 believe it was video posted on the *Washington Post*.  I'm not

3 sure if they actually took it originally, but that's where we

4 saw it.

5         And in that video, Your Honor, you can see the

6 defendant in a brown -- what appears to be a brown or tan

7 Carhartt jacket, a black or gray helmet.  He's got a green

8 backpack on his back, and he is wearing black gloves on his

9 hands.  He would later admit that that was him in the video, and

10 that he was, in fact, in a fit of rage at the time that that

11 video was shot, and the jacket that he was wearing was recovered

12 by law enforcement; the jacket and the backpack were recovered

13 from the car that Mr. Sabol was found in on January 11th by the

14 Clarkstown Police Department.

15         And, Your Honor, what do we see in that video?  We see

16 the defendant dragging a police officer down a set of stairs

17 just outside the Capitol.  I believe it was just outside one of

18 those archways where a lot of the scrum was happening that day;

19 and in the course of dragging this police officer down the

20 stairs, this allows another man who was standing nearby to beat

21 that officer with an American flag, ironically, as the officer

22 is being dragged down the stairs.

23         Other images which are captured in the complaint show

24 the defendant holding a police baton across the police officer's

25 neck, and I can proffer, Your Honor, that we have reason to

1 believe that he may have assaulted another police officer to

2 procure that baton, which may result in additional charges in

3 this case.

4          And against this video and photographic evidence we

5 have the defendant's self-serving statements to law enforcement

6 that he was trying to protect the officer.  Of course, as I

7 mentioned a moment ago, he also admitted to being in a fit of

8 rage that day and that the details of the day were "cloudy,"

9 and, Your Honor, I think overall I would just submit that a

10 picture is worth a thousand words.

11          With respect to flight, Your Honor -- and I informed

12 Mr. Ser of this in advance of the proceeding -- I can proffer

13 that following the chaos at the Capitol the defendant

14 participated in, he actually tried to flee the country.  We have

15 evidence that he booked a flight from Logan Airport in Boston to

16 Zurich, Switzerland.  And of course what is one of the many

17 things that Switzerland is known for?  Well, one of them is

18 being a non-extradition country, and this is a man who is

19 obviously aware that he is facing some kind of criminal charges,

20 so he buys a ticket to a place where he thinks he won't get

21 shipped back home to face the music.

22          And, Your Honor, I know that as a standard condition

23 of pretrial release, defendants are compelled to surrender any

24 passports that they hold, and even if that were to happen here,

25 Your Honor, I think this still evinces a proclivity towards

1   flight that will not be eliminated by handing over the passport.

2          I believe that Mr. Ser is also likely to emphasize

3   that Mr. Sabol has had steady employment and steady residence in

4   Colorado for the past couple of decades to show that he is not a

5   flight risk.  You know, I think that these things, Your Honor,

6   also point to the fact that he has the means to run away from

7   his actions, and he's obviously demonstrated that he has the

8   will; and as we learned at the beginning of this proceeding, he

9   also apparently has enough means to retain his own counsel,

10  which further suggests that he may pose a flight risk.

11         There is also overwhelming evidence in this case.  As

12  I mentioned, this is a case that's built on video.  As I've said

13  before, a picture is worth a thousand words.  He's also admitted

14  that he was in that video.  He admits that he was there.  He

15  admits what clothing he was wearing, and it's the clothing that

16  we see in that video and that some of which we were able to

17  recover.  And, Your Honor, you know, I really -- I don't like to

18  bring this up, but I think it's appropriate, unfortunately, in

19  this context, and I'm sorry, frankly, for what Mr. Sabol has

20  been through since he left the Capitol, but I think, Your Honor,

21  that his suicide attempt can be taken as consciousness of guilt,

22  and in some respects really the ultimate flight attempt.  This

23  is a man who just can't face the fact that he is facing a felony

24  charge because of his actions on January 6th.

25         So unless Your Honor has any questions for me, that's

```
 1  the government's presentation on detention.

 2          THE COURT:  Thank you, Mr. Gianforti.  I don't have

 3  any questions for you at the moment, though I may come back to

 4  you with additional questions.

 5          For the record, and to be clear, since this is a

 6  public proceeding which has generated a certain amount of public

 7  interest, and since perhaps more importantly, since I have

 8  considered the video that you provided to both me and to defense

 9  counsel as part of my preparation for this conference today, can

10  you please read the URL for the website where the video is

11  located so that can be a matter of public record?  In other

12  proceedings where videos have been referenced I believe the web

13  address for those videos have been included in some of the

14  public documents, including the agent's affidavit in support of

15  the criminal complaint.  Unless I'm mistaken, I believe that the

16  URL for this particular video is not included in the documents

17  that will be publicly available for this proceeding.  So just so

18  the record can be clear, both for the public and for any future

19  proceedings that may take place in this case, can you please

20  just read that website into the record, Mr. Gianforti?

21          MR. GIANFORTI:  Yes.  Happy to.  It's

22  https://www.washingtonpost.com/nation/2021/01/11/police-beating-

23  Capitol-mob/.

24          THE COURT:  Thank you, Mr. Gianforti.

25          Mr. Ser, let me turn to you.
```

1     MR. SER:  Thank you, Your Honor.  We are seeking

2  release in this case.  I am asking the Court to release Mr.

3  Sabol on a personal appearance bond in the amount of $200,000 to

4  be secured by the signatures of three financially responsible

5  adults, along with the conditions recommended by the Pretrial

6  Service Office in the pretrial service report, which includes

7  home confinement and location monitoring.  We do believe these

8  would help guarantee Mr. Sabol's future appearances in the court

9  and the safety of the community.  We don't think the government

10  can satisfy its burden, either by a preponderance for flight or

11  by clear and convincing evidence, for any danger in this case.

12  And so a personal appearance bond would be appropriate here, and

13  we would ask the Court to consider releasing Mr. Sabol on his

14  own signature today and give us seven days to secure the

15  signatures, or even five days to secure the signatures of family

16  members; and as I go through the 3142(g) factors, I will

17  identify who I have spoken to, and who at this point is willing

18  to act as a surety in the case.

19     So first, the nature and circumstances of the offense.

20  The government, obviously, relies on this and the weight of the

21  evidence as their two strongest arguments in support of

22  detention.  One thing I want to point out is the charge right

23  now is not an assault charge.  The charge is civil disobedience

24  and more of an interference-based charge as opposed to a

25  Section 111 charge, which is a bit different, especially since

1   there is only a five-year maximum as opposed to something

2   higher.  So he has not been charged with assault as you would

3   sometimes see.

4          The government notes that other individuals were

5   present at the scene.  A mob was obviously present, and other

6   individuals were doing -- were allegedly assaulting officers.

7   As I've argued in the past, obviously, there's no conspiracy

8   being charged here, and I know the Court will not hold Mr. Sabol

9   responsible for what other actors may have done on video, but I

10  would also note that the assault, the alleged assault the

11  government brought up in its presentation with regard to a

12  baton, I think that's on information and belief here.  It's

13  certainly not alleged in a complaint.  It's not sworn to under

14  penalty of perjury by any officer.  So that's outside the four

15  corners of even the Statement of Facts submitted in the District

16  of Columbia case.

17         So while the government relies on the nature and

18  circumstances of the offense, obviously, the charges here are a

19  bit different than some of the other cases we have seen; and I

20  would simply point to some of the statements in the Statement of

21  Facts that were recorded with regard to Mr. Sabol's explanation

22  of events in mitigation.

23         The weight of the evidence:  Here, obviously, there is

24  video, and while the video captures things, and it may be worth

25  a thousand words to the government, it's not a hundred percent

1  clear on the video I watched from the *Washington Post* site, but

2  the Statement of Facts talks in terms like "seems" on page 4,

3  with regard to what alleged activity was taking place.  They say

4  it "presumes officer's leg was grabbed" on page 3.  So I'm not

5  sure the video is as clearcut given the language in the

6  Statement of Facts that talks of him in the context of, as I

7  mentioned the word "seems," and it presumes certain facts there.

8          But, again, the weight of the evidence is the least

9  important of all the factors here.

10          The history and characteristics of Mr. Sabol are very

11  strong in this case and good support for bail being sought.  His

12  character is positive.  He was born in Utica, New York; raised

13  by his parents in Waterville where he graduated high school.  He

14  obtained a Bachelor of Science in Physics at SUNY Cortland.  He

15  moved from New York to Colorado in his early 20s, and since

16  arriving in Colorado, has been gainfully employed without a

17  break as a geophysicist.  He's been working in the fields of oil

18  and gas, environmental renovation or reclamation consistent with

19  things like the Superfund cleanups.  I will go into his

20  employment in more detail in a few minutes.

21          He's lived at two separate residences in Colorado

22  during that time in that span of 28 years, including his current

23  residence where he has lived for over eight and a half years,

24  where he lives with his partner and his children, which I will

25  get into in a moment.  He is previously married, but divorced

1  with three children ages 19, 19 and 15.  He has twins.  He and

2  his partner have been together eight and a half years, and he

3  has had, as I mentioned earlier, a very successful career as a

4  geophysicist.

5         His physical condition right now isn't one that would

6  make him a risk of flight or a danger, and I would like to

7  briefly just discuss the mental health issue that the government

8  brought up.  It's my understanding that Mr. Sabol was

9  hospitalized at Westchester Medical Center for several days.

10 Thereafter, he was under treatment at a psychiatric center for

11 seven days, but the psychiatric center discharged him.  He's

12 clearly stable during the course of our video.  He's lucid,

13 coherent; understands what's taking place; is by all means

14 cooperative, it would seem, in terms of the discussions with the

15 Court.  My understanding is he has been extremely cooperative

16 with the agents.  As the Statement of Facts indicates, he's made

17 statements and spoken with them.  When I interviewed him, he was

18 coherent, lucid and understood what was going on, and he did

19 inform Pretrial Services that he is not suicidal.  He is clearly

20 stabilized, and whatever did occur now two weeks ago seems to be

21 very different as far as his mental state now, and so I would

22 submit that his stability is one that here at this time does not

23 create a risk of flight.

24        With regard to his family ties, he has very strong

25 family ties to the Colorado area, as I indicated earlier, and is

1 set out in the pretrial services report.  He has lived with his

2 partner of eight and a half years.  I've spoken with her.  She

3 resides at the address provided in the pretrial service report.

4 She is gainfully employed; works in an elementary school in

5 their dietary management office.  She is willing to sign the

6 bail in this case and would be an ideal surety given her

7 background.

8            As I mentioned earlier, he has three children.  His

9 two daughters are both students.  One lives with him off and on

10 and rotates back and forth with his ex-wife.  The other lives

11 with him for a weekend occasionally.  Both were on virtual

12 schooling, but he is in constant contact with both.  He has

13 parents who reside in the Waterville, New York area.  They are

14 retired.  I spoke with both of them earlier before the court

15 proceeding.  They are aware of what's been going on.  They, too,

16 are willing to sign on a bond in this case.  So the three

17 sureties would include his two parents and his partner of eight

18 and a half years, which I think would provide significant moral

19 suasion for Mr. Sabol to make his appearances and follow all the

20 conditions imposed by the Court.

21            He does have other family, including a sister who is a

22 colonel in the U.S. Army.  She lives in Georgia.  So he does

23 have a fairly strong support system in place if he were to be

24 released.

25            His employment history, frankly, is second to none and

1  quite strong.  As he indicated, he has a bachelor of science.

2  He obtained that from SUNY Cortland in physics.  Since arriving

3  in Colorado, he's worked in all sorts of environmental-based

4  companies.  His current employment has lasted over seven years.

5  The employment previous to that was 13 years, so for at least

6  the last 20 years, he has held positions with two companies.

7  His current position has him working as a supervisor overseeing

8  a number of employees, contractors, and work programs going on,

9  and his current specialty is removing unexploded ordnances from

10  federal testing grounds for the military.  So he has a fairly

11  interesting background and believes he can return to work if he

12  is released.

13          His length of time in the community and family ties I

14  have already addressed.  He's spent 28 years in Colorado, and

15  before that his entire life was in the Upstate New York area.

16          While he has, it looks like according to Pretrial,

17  some contacts with law enforcement.  I know the DUI was in '98.

18  That was a long time ago.  I believe that one was dismissed.

19  And then the 2017 one identified, my understanding is that, too,

20  was dismissed on sort of a deferred prosecution style basis

21  based on what I am being told, but I don't have any documents

22  for that, and I didn't get a rap sheet.  That's my

23  understanding, anyway.

24          Mr. Sabol is not an addict of drugs; doesn't drink to

25  excess.  He's got no history of failing to appear as the

1  pretrial service report makes clear.  He is not on any sort of

2  supervisory status, and so I do think the conditions that I

3  requested earlier would guarantee his appearance and the safety

4  of the community, including the home confinement and location

5  monitoring.

6             THE COURT:  Are you done, Mr. Ser?

7             MR. SER:  Yes, Your Honor.

8             THE COURT:  Okay.  Sorry.  I just didn't want to jump

9  in if you had any more to say.

10             I understand that the government has just raised the

11  issue of Mr. Sabol's purchase of a plane ticket.  I understand

12  that's not set forth in any of the documents.  I heard it for

13  the first time when Mr. Gianforti referred to it.  Do you have

14  anything you would like to say in response to that piece of the

15  government's presentation?

16             MR. SER:  Obviously, that's concerning.  I don't want

17  to say it isn't, but I do think the Court can order conditions

18  that would even address any concern about travel like that.

19  One, relinquishing his passport to Pretrial Services.  My

20  understanding is that the FBI has seized his passport; certainly

21  conditions limiting any sort of travel.  Home confinement in

22  particular, and electronic monitoring are ways to monitor and

23  manage his whereabouts, but conditions including no new

24  applications for travel documents or anything along those lines

25  I think would be sufficient here.

1          THE COURT:  Okay.  I mean, I will say that it could

2   always be the case that those conditions would be available for

3   a judge in setting conditions of release, and if that were

4   always sufficient to address the risk of flight, there would

5   never be a finding of a risk of flight.  So I'm not sure that in

6   and of itself is sufficient.

7          MR. SER:  Right.  But I think location monitoring and

8   home confinement here are significant.  Those aren't imposed in

9   every case, and that is one way of managing.

10         In addition, we do have three sureties who I think

11  provide significant moral suasion, which weren't in place at the

12  time of the alleged purchase of the ticket, obviously.  He has

13  now been charged.  He understands he's got to appear in court.

14  So I think he's in a very different situation right now.

15         I also think mind-set-wise, I think, you know, things

16  have obviously staggered, and he has had time to think about it.

17  Certainly, his family is supportive of him, which I think is

18  always a fear of an individual being charged.  So I think there

19  are many conditions, not just the ones I briefly mentioned, that

20  Your Honor identified.  I think as a totality here, the

21  conditions would address that particular concern.

22         Now, I should note, in spite of buying a ticket, he

23  was found in I believe a rental car in the New City area.  He

24  very well could have driven to Canada to the border.  He did

25  not.  That was not his next step.  So certainly, you know, I

```
 1  think if there was a ticket purchased, you know, and that there

 2  was, his conduct after that could have been worse.  So I do

 3  think the conditions we are requesting here hopefully would

 4  guarantee appearance in the future.

 5           THE COURT:  Understood, Mr. Ser.  Thank you.

 6           Mr. Gianforti, does the government have anything

 7  further to add in response?

 8           MR. GIANFORTI:  Yes.  Just briefly, Your Honor.

 9           I have to take -- I have to disagree strongly with

10  Mr. Ser's position that home confinement and location monitoring

11  will be enough to deter this defendant from running away from

12  the charges that he currently faces, Your Honor.  I mean, the

13  ticket to Zurich, again, a well-known non- extradition country

14  and the suicide attempt, I think, Your Honor, both demonstrate

15  the extreme lengths to which this man is willing to go to not

16  face these charges.

17           And again, you know, Mr. Ser emphasized his family

18  ties to Colorado, his children; but again, I think that the --

19  that the flight attempt here flies in the face of all of that.

20  If he was so serious about, you know, staying with his family,

21  then why was he prepared to go to Zurich?  Why did he attempt to

22  take his own life?  I mean, frankly, why was he at the Capitol

23  that day if he felt so strongly about staying close to his

24  family?

25           And, Your Honor, I guess, you know, this may not be
```

1  the precise moment to bring it up, but just so you are aware,

2  you know, if you are minded to grant bail, we will be seeking a

3  stay just so we can appeal to the district of the District of

4  Columbia; and the only reason I raise that is because if you are

5  minded to grant bail and not to stay your order granting bail, I

6  would ask for some additional conditions in this case, the first

7  of which would be a so-called stay-away order.  So in other

8  words, an order that prohibits the defendant from traveling to

9  the District of Columbia for any reason other than an in-person

10 court proceeding, and my understanding is that most court

11 proceedings there are happening remotely.

12        And in terms of the other conditions of bail, Your

13 Honor, I think it would be appropriate to -- for the bond to be

14 secured either by his home -- I'm not sure if he owns his home.

15 If he doesn't, then perhaps a sum of cash because I think that

16 he's just demonstrated that he has the financial means and the

17 wherewithal to flee these charges, and so it should hurt

18 financially a little bit if that's the road that he chooses to

19 go if you, in fact, do bail him, Your Honor.

20        MR. SER:  Your Honor, can I just address the request

21 to stay here?  There is no statutory basis for that.  The proper

22 statutory route would be, of course, appeal to the district

23 judge.  If the government were able to ask for a stay pending

24 the bail hearing in D.C., the district of origin here, that

25 would swallow the rule for bail on every Rule 5(c)(3) case that

1  would appear.  So I would oppose any request for a stay on that

2  basis.

3            THE COURT:  Okay.  I don't think we need to get into a

4  whole ancillary argument on that at the moment.

5            Let me just say at the outset, any party can appeal

6  any decision of mine if they think that it is appealable.  That

7  really has no influence whatsoever on my decision-making

8  process.  That is -- different judges have different roles to

9  play in our criminal justice system.  My role is to make an

10 initial determination with respect to bail, detention or

11 release.  I will do that momentarily.

12           If the government wants to appeal that decision, the

13 government can appeal that decision.  If the defendant wants to

14 appeal that decision, the defendant can appeal that decision,

15 and whatever happens will happen.  I just want to state at the

16 outset that just because the government has made the point about

17 a potential appeal does not have any bearing on my decision

18 whatsoever.  Every decision I make I realize may be subject to

19 appeal by one party or the other.  That's the nature of my

20 responsibility here, and so I just want to be 100 percent clear

21 for the record that that has no bearing whatsoever on my thought

22 process here today.

23           I thank counsel for their arguments and all of the

24 points that they have raised for my consideration.

25           Mr. Gianforti, we didn't specifically address this,

1  but I assume you agree that this is not a presumption case in

2  light of the charges, correct?

3              MR. GIANFORTI:  That's right, Your Honor.

4              THE COURT:  So what that means -- of course counsel

5  know -- that this is a case where the government ultimately

6  bears the burden of establishing by clear and convincing

7  evidence that Mr. Sabol is a danger to the community or

8  establishing by a preponderance of the evidence that Mr. Sabol

9  is a flight risk.

10             My determination here today is that the government has

11 met its burden with respect to both of those prongs, and

12 Mr. Sabol will be detained both because he is a danger to the

13 community and because the government has established by a

14 preponderance of the evidence that there is a risk of flight.

15             Before I get into the details, I will also just say

16 there were various references in counsel's arguments today to

17 Mr. Sabol's mental health condition and a prior suicide attempt

18 and how that should factor into my decision-making process.  I

19 will say that also does not factor into my decision-making

20 process.  I don't believe that whatever mental health crisis

21 Mr. Sabol was going through is particularly indicative of

22 anything, or it may be indicative of many things, and I am loath

23 to try to isolate whatever factors may have been involved in

24 that particular moment of crisis and hold that against Mr. Sabol

25 in this context.  I believe there is sufficient evidence put

1  forward by the government that Mr. Sabol should be detained, but

2  I do want to emphasize, because I think it's important not to

3  cloud the record, that that particular issue that was raised by

4  the government as part of the package -- I don't criticize

5  anyone for raising the issue -- but from my perspective, the way

6  I think about this case, that aspect of it is not part of my

7  decision-making process because I recognize, as we all do, that

8  many, many factors could lead a person to that type of crisis

9  and that point of desperation; and whatever those were for

10  Mr. Sobel -- Sabol -- excuse me for saying that again -- that is

11  not part of my analysis in this case.

12          What weighs very, very heavily -- I've told you what

13  doesn't weigh heavily on my decision-making process -- but what

14  weighs very, very heavily on my decision-making process here is

15  the nature and the circumstances of the offense.  It is true

16  that Mr. Sabol is charged, not with the 18 U.S.C. 111 assault

17  offense that we have seen in other cases in this district this

18  week, in fact, but the allegations set forth in the Statement of

19  Facts in support of the criminal complaint, as supported by the

20  video evidence as Mr. Gianforti has submitted, along with that

21  criminal complaint, are very disturbing, deeply troubling.

22          What we see is Mr. Sabol, part of a group of people,

23  dragging a law enforcement officer down the steps of a building

24  at the Capitol where that officer is then repeatedly assaulted

25  by a number of people, apparently including Mr. Sabol.  I

1  understand that Mr. Sabol has made some statements about what

2  his role was.  I agree with the government that those are

3  self-serving statements, and I am also heavily persuaded by

4  Mr. Sabol's additional statement during questioning by

5  authorities that he was in a fit of rage during the events in

6  question; and in fact, that is what appears on this video and in

7  the still photographs that are included in the supporting

8  documents.  That conduct is beyond the pale, and it is troubling

9  to a degree that it really -- I find it shocking.

10         And I also see in that video that the person, who

11  apparently Mr. Sabol, dressed as described in the criminal

12  complaint, and as conceded to by Mr. Sabol during his interview,

13  goes back up the stairs after the first episode of bringing

14  somebody down, a law enforcement officer, down those stairs into

15  the teeth of that mob that was at the Capitol that day.

16         These are extremely serious actions, and those actions

17  have consequences, and those consequences today will include

18  Mr. Sabol being detained pending further proceedings in this

19  case.

20         I believe the weight of the evidence against Mr. Sabol

21  is strong, although I take Mr. Ser's point that there may be

22  arguments to be made in his defense.  This is not a trial.  This

23  is -- that's not the point of our proceedings here today, and

24  those things will be hashed out in the future in this case, but

25  the nature and the circumstances of the offense are extremely

1  severe.  The weight of the evidence is strong.

2          I do take Mr. Ser's point that Mr. Sabol's history and

3  characteristics tend to support release, arguably.  I am struck

4  by the fact that a person of Mr. Sabol's stable employment,

5  strong family ties, deep roots in the community would engage in

6  this conduct, and it greatly cuts against the nature of his

7  history and characteristics that, despite all of that, he did go

8  and participate in this conduct on January 6th.

9          So while I do recognize that Mr. Sabol has many things

10 going for him in life in terms of his employment, and his family

11 ties, and his financial means, none of that stopped him from

12 engaging in the conduct that we see described in the criminal

13 complaint and the conduct we see captured on the video in this

14 case.  So -- and I cannot say with any confidence or certainty

15 that similar actions might not occur in the future.  Whatever

16 prompted those actions to occur on January 6th, those conditions

17 still exist in our world today, in our country, in Mr. Sabol's

18 mind, and I do believe that Mr. Sabol continues to pose a danger

19 to the community and would pose that if released.

20         As to the risk of flight, I think that the information

21 proffered by the government with respect to Mr. Sabol's attempt

22 to purchase a plane ticket to Switzerland is certainly

23 indicative of a potential risk of flight in this case.  The fact

24 that he was here in the New York area is unexplained as opposed

25 to why he didn't head back to Colorado after the events of

1   January 6th.  That's not part of the record before me, but the

2   allegation from the government is that that flight was booked

3   from an airport here on the east coast, so there are

4   circumstantial elements of the facts here that support that

5   proffer from the government; and I agree with Mr. Gianforti's

6   argument that the indication that Mr. Sabol had a willingness to

7   flee also undercuts the notion that his strong family ties and

8   his strong employment record would be a basis to order his

9   release.  He appears to have been willing to cast those aside in

10  order to try to avoid the serious criminal charges that he faces

11  in this case; and while certainly conditions could be crafted

12  that would be designed to prevent any flight in the future,

13  that's always the case, as I mentioned to Mr. Ser, and I

14  understand Mr. Ser's arguments about how there may be other

15  aspects of this case that support release.  But on balance, I

16  believe the government has demonstrated by a preponderance of

17  the evidence that Mr. Sabol is a risk of flight in this

18  situation, and that is an alternate basis for detention here.

19         So with all of that said, Mr. Sabol will be remanded

20  to the custody of the Attorney General for confinement in a

21  correction facility separate, to the extent practicable, from

22  persons awaiting or serving sentences or being held in custody

23  pending appeal.  Mr. Sabol must be afforded a reasonable

24  opportunity for private consultation with defense counsel.  On

25  order of a court of the United States or on request of an

1  attorney for the government, the person in charge of the

2  corrections facility must deliver Mr. Sabol to a United States

3  marshal for the purpose of an appearance in connection with a

4  court proceeding.

5           I see -- just let me pause a second.  I see that we've

6  lost Mr. Gianforti on video.  Do we still have you on audio?

7           MR. GIANFORTI:  You have me on audio.  I just turned

8  off my camera for a moment, Your Honor.  I will turn it back on.

9           THE COURT:  That's fine.  I just want to make sure we

10 didn't lose you.

11          MR. GIANFORTI:  Yes.

12          THE COURT:  I will also say I meant to mention earlier

13 that I did review and consider the report from Pretrial Services

14 in this matter, which did recommend a bail package for release

15 for Mr. Sabol.  I always appreciate the very hard work of the

16 Pretrial Services Office.  I take their recommendations very

17 seriously, and that is a meaningful and important consideration

18 to me in every case that is before me; but in this case I

19 respectfully disagree with the recommendation, which is why I

20 have made the findings and issued the order that I have issued

21 just now.

22          Now, Mr. Ser, I always ask this question, but it's of

23 particular relevance here in light of the circumstances that we

24 have discussed at various points today.  Are there medical needs

25 that I should include in the order with respect to Mr. Sabol?

1    MR. SER:  I am not aware of any at this time, Your

2  Honor, beyond his taking antibiotics.  So if we can issue a

3  medical order to ensure that he is continually provided the

4  antibiotics through the end of the prescriptive period, and then

5  perhaps have medical officials at the jail double-check to make

6  sure that those would be renewed -- doesn't have to be renewed

7  for a longer period of time.  I think that's the only thing

8  that's out there.  I will speak to Mr. Sabol about his options

9  and what he can seek as well on his own.

10    THE COURT:  Okay.  And I should say also, as I alluded

11  to at the beginning of my ruling, that parties may appeal my

12  ruling.  That is always the case, and I just want to reiterate

13  that for Mr. Sabol so that he is aware that he can and should

14  consult about whatever appeal rights he may wish to pursue when

15  he retains counsel in this matter.

16    Okay.  So Mr. Sabol has waived the identity hearing in

17  this matter, and I will therefore order that Mr. Sabol be

18  removed from the Southern District of New York to the District

19  of D.C.  I understand from prior matters this week that that

20  removal will not take place immediately because of various

21  logistical challenges and considerations having to do with the

22  public health crisis.

23    Mr. Gianforti, do you have any -- can you provide us

24  with the current information that you have about the potential

25  or the timing of the transfer of Mr. Sabol to the District of

1  D.C.?

2        MR. GIANFORTI:  Your Honor, I believe it's still

3  status quo from when -- from previous proceedings we have had

4  together this week that the marshals don't know the next time

5  they will be able to do transports outside of our district.  I

6  would imagine it will be in, at a minimum, weeks, hopefully not

7  longer, but with Covid, everything is quite uncertain at the

8  moment.  But I'm certainly happy to keep the Court apprised of

9  any developments on that front.

10        THE COURT:  Thank you, Mr. Gianforti.  We'll set a

11  date for a status report to the Court about that and any other

12  outstanding issues.  I know that we have set the date for the

13  pretrial hearing.  Excuse me.  We've set a date for the

14  preliminary hearing.

15        Mr. Gianforti, yesterday we had a different bit of

16  information in a proceeding regarding the setting of an initial

17  appearance date in the District of D.C., so I'm not sure where

18  we currently stand with that.  What are you being told by your

19  colleagues in Washington with respect to setting a date for an

20  appearance in the District of D.C.?

21        MR. GIANFORTI:  Your Honor, you may have more current

22  information than do I at this point.  I'm still under the

23  understanding that you are simply to pick a date, a weekday at

24  1:00 p.m., and that the U.S. Attorney's Office down there will

25  apprise the Court, and then that will become his initial

1  conference down there, but it sounds like you may have -- I know

2  there was one of these presentments yesterday.  There may be a

3  different procedure now I am just not aware of.

4          THE COURT:  No.  It wasn't a different procedure.

5  It's just that yesterday your colleague here in New York did not

6  ask for that, and so I didn't order it because as we have

7  discussed in the past, it is an unusual procedure for a

8  magistrate judge here in the Southern District of New York to

9  set a calendared date for a proceeding before a magistrate judge

10 in the District of D.C.  Yet in the past, that is what you have

11 instructed me to do based on the instructions from my colleagues

12 in D.C., apparently, my magistrate colleagues in D.C.

13          So if that is what you believe should be done, I will

14 set that date, and the parties can have further discussions

15 about whether that date will hold or whatever the next steps may

16 be.  So I'm going to set that date as two weeks from today,

17 which will be Friday, February 5th,

18 for an initial appearance in the District of D.C. before a

19 magistrate judge there who is to be assigned, presumably, or who

20 will be assigned on a rotating basis, depending on the timing.

21 So we will set that date for Friday, February 5th at 1:00 p.m.

22          My understanding, Mr. Ser and Mr. Sabol, is that that

23 proceeding is likely -- well, really almost certainly will take

24 place via remote means, but the government will be in touch with

25 counsel, whether that's Mr. Ser or retained counsel, in the near

1   future.

2           Mr. Ser, you will please just make sure to transition

3   any relevant information to counsel once counsel is retained in

4   this matter.

5           Mr. Sabol, I will just remind you, as I said at the

6   outset, please make sure you work on retaining counsel.  Make

7   that your top priority.  Work with your family to do whatever

8   needs to be done because you really need to have counsel, and

9   Mr. Ser was only provisionally appointed for purposes of the

10  work that he did today.

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Thank you.  Okay.

13          Now, I believe that takes care of everything that we

14  need to address today, but let me check with counsel.

15          Mr. Gianforti, anything further for us to address from

16  the government?

17          MR. GIANFORTI:  No.  I believe that covers everything,

18  Your Honor.  Thank you.

19          THE COURT:  Thank you, Mr. Gianforti.

20          Mr. Ser, anything from the defendant's perspective?

21          MR. SER:  Your Honor, I just wanted to double-check

22  the next court date is going to be February 5th because you

23  mentioned the 7th after that as well.  So I just want to make

24  sure the 5th is the one we are going with.

25          THE COURT:  I'm sorry.  I didn't mean to do that.  The

```
 1  7th is a Sunday.  So it's Friday, February 5th, 1:00 p.m., and
 2  the preliminary hearing date we have set at Friday,
 3  February 19th.  Although that will be subject to, I'm sure,
 4  further discussion in the ensuing weeks.  And so --
 5            MR. SER:  I have nothing further, then, Your Honor.
 6            THE COURT:  -- the request for the medical order,
 7  which we will take care of today, along with the removal order,
 8  we will get those before the close of business.
 9            MR. SER:  So I have nothing further, Your Honor.
10  Thank you very much.
11            THE COURT:  Thank you, counsel.  Thank you, Mr. Sabol.
12  We are adjourned for today.  Take care.
13
14
15
16
17
18
19
20
21
22
23
24
25
```